

ORIGINAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUL - 3 2007

CLERK, U.S. DISTRICT COURT
By _____
             Deputy

ERNEST GOTTDIENER and SAMUEL T. §
COHEN, *on behalf of themselves and all* §
*others similarly situated,* §
§
                    Plaintiffs, §
§        Civil Action No. _____
§        **3-07 CV 1 2 0 0 -P**
    vs. §
§
LELDON E. ECHOLS, KERNEY LADAY, §
JACK E. LITTLE, GERARDO I. LOPEZ, J. §
E. OESTERREICHER, MICHAEL W. §
RANGER, LEONARD H. ROBERTS, §
GLENN F. TILTON, C. JOHN WILDER, §
TXU CORP., KOHLBERG KRAVIS §
ROBERTS & CO., and TEXAS PACIFIC §
GROUP, §
§
                    Defendants. §

## PLAINTIFFS' CLASS ACTION COMPLAINT

## INTRODUCTION

1.       This is a shareholder class ("Action") on behalf of the public shareholders of TXU Corp. ("TXU" or the "Company") against TXU, TXU's Board of Directors ("Board") and Kohlberg Kravis Roberts & Co. ("KKR") and Texas Pacific Group ("TPG"), the latter of which are two of the country's lead private equity firms ("Board," "KKR" and "TPG" collectively referred to hereinafter as "Defendants"), in connection with Defendants' agreement to sell the Company to KKR and TPG (the "Proposed Acquisition") in violation of their fiduciary obligations.  GS Capital Partners VI Fund, L.P. and affiliated funds ("Goldman Sachs"), Lehman Brothers Holdings Inc. ("Lehman"), Citigroup and Morgan Stanley will join KKR and TPG as equity investors at the closing (the "Investor Group").

## JURISDICTION AND VENUE

2.       This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2).  Diversity exists between each plaintiff and each defendant, and the amount in controversy exceeds $75,000.  This Action is not collusive designed to confer jurisdiction on a court of the United States it would otherwise not have.

3.       Venue is proper in this District pursuant to 28 U.S.C. §1391(b) insofar as many of the acts and practices complained of herein occurred in this District.  Defendant TXU is headquartered in this District, and one or more Defendants either reside in or maintain executive offices in this District.

## PARTIES

4.       Plaintiff Ernest Gottdiener, a citizen of Florida, has been the owner of shares of the Company since prior to the Proposed Acquisition herein complained of and continuously through the present Action.

24786

2

5.    Plaintiff Samuel T. Cohen, a citizen of Maryland, has been the owner of shares of the Company since prior to the Proposed Acquisition herein complained of and continuously through the present Action.

6.    Defendant TXU is a corporation duly organized and existing under the laws of the State of Texas with its principal offices located at 1601 Bryan Street, Dallas, TX 75201-3411. TXU operates as a holding company managing a portfolio of competitive and regulated energy businesses in Texas. As of November 6, 2006, the Company had over 459,240,549 shares of common stock outstanding.

7.    Defendant C. John Wilder ("Wilder"), a citizen of Texas, is and, at all times relevant to the Action, has been the Chairman, President and Chief Executive Officer of the Company. Defendant Wilder, who has expressed a desire to stay with the Company following the close of the merger, stands to reap a rich payday. He negotiated a lucrative compensation package three years ago. By some estimates, he may now be eligible for well over $100 million in payments, reflecting the full vesting of several large stock allotments called for under his complex five-year employment contract. In addition, Defendant Wilder has longstanding ties with KKR.

8.    Defendant Leldon E. Echols ("Echols"), a citizen of Texas, is and, at all times relevant to the Action, has been a director of the Company.

9.    Defendant Kerney Laday ("Laday"), a citizen of Texas, is and was at all relevant times a director of the Company. Defendant Laday is President of The Laday Company (management consulting and business development) since July 1995; prior thereto Vice President, field operations, Southern Region, U. S. Customer Operations, Xerox Corporation

24786

3

(January 1991 – June 1995); prior thereto Vice President and region general manager, Xerox (1986 – 1991). Defendant Laday has performed consulting services for the Company.

10.     Defendant Jack E. Little ("Little"), a citizen of Texas, is and, at all times relevant to the Action, has been a director of the Company.

11.     Defendant Gerardo I. Lopez ("Lopez"), a citizen of Washington, is and, at all times relevant to the Action, has been a director of the Company.

12.     Defendant J. E. Oesterreicher ("Oesterreicher"), a citizen of Texas, is and was at all relevant times a director of the Company. Defendant Oesterreicher is the retired Chairman of the Board and Chief Executive Officer of J. C. Penney Company, Inc. since September 2000; prior thereto Chairman of the Board and Chief Executive Officer of J. C. Penney Company, Inc. (January 1997 – September 2000); prior thereto Vice Chairman of the Board and Chief Executive Officer of J. C. Penney Company, Inc. (January 1995 – January 1997); prior thereto President, J. C. Penney Stores and Catalog (1992 – 1995).

13.     Defendant Michael W. Ranger ("Ranger"), a citizen of New York, is and was at all relevant times a director of the Company. Defendant Ranger is a Senior Managing Director, Diamond Castle Holdings, LLC (private equity investments) since 2004; prior thereto consultant to CSFB Private Equity, overseeing private equity investments in the energy and power industries, (2002 – 2004); prior thereto Managing Director, Investment Banking, of Credit Suisse First Boston (2000 – 2001); prior thereto Managing Director and Group Head of Global Energy and Power Group, Investment Banking, of Donaldson, Lufkin & Jenrette Securities Corporation (1990 – 2000).

24786

14. Defendant Leonard H. Roberts ("Roberts"), a citizen of Texas, is and was at all relevant times a director of the Company. Defendant Roberts is also a director of J. C. Penney Company, Inc.

15. Defendant Glenn F. Tilton ("Tilton"), a citizen of Illinois, is and, at all times relevant to the Action, has been a director of the Company.

16. Defendants Wilder, Echols, Laday, Little, Lopez, Oesterreicher, Ranger, Roberts and Tilton are, at times, collectively referred to herein as the "Individual Defendants." The Individual Defendants constitute the Board of Directors of TXU and, by reason of their corporate directorships and/or senior executive positions at the Company, owe fiduciary duties of good faith, due care and loyalty to TXU's public shareholders. At all times relevant herein, the Individual Defendants were obligated to use their best judgment in a prudent manner and in the best interest of the Company's public shareholders. The Individual Defendants were also required to conduct themselves with the highest duties of fair dealing and adequate, full, complete and candid disclosure.

17. Defendant KKR, a citizen of New York, is a private equity firm specializing in management buyouts, and operates out of New York, Menlo Park, California; London; Paris; Hong Kong and Tokyo.

18. Defendant TPG, a citizen of Texas, is a private investment, is headquartered in Fort Worth, Texas and also operates out of San Francisco; London; Hong Kong: New York; Minneapolis; Melbourne; Menlo Park, California; Mumbai; Shanghai; Singapore and Tokyo.

## CLASS ACTION ALLEGATIONS

19. Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on their own behalf and as a class action on behalf of all TXU common shareholders

24786

(except the Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the defendants) or their successors in interest, who are or will be threatened with injury arising from defendants' actions as more fully described herein (the "Class").

20.     This action is properly maintainable as a class action for the following reasons:

a)     The Class is so numerous that joinder of all members is impracticable. As of November 6, 2006, the Company had outstanding over 459,240,549 shares of its common stock;

b)     There are questions of law and fact which are common to the class including, *inter alia*, the following: (i) whether Defendants have breached their fiduciary and other common law duties owed by them to Plaintiffs and the members of the class; (ii) whether the proposed acquisition, hereinafter described, constitutes a breach of the duty of fair dealing and/or candor with respect to the Plaintiffs and the other members of the class; and (iii) whether the class is entitled to injunctive relief or damages as a result of Defendants' wrongful conduct;

c)     Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  The claims of Plaintiffs are typical of the claims of the other members of the class, and Plaintiffs have the same interests as the other members of the class.  Plaintiffs will fairly and adequately represent the class;

d)     The prosecution of separate actions by individual members of the class would create the risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of

24786

6

conduct for Defendants, or adjudications with respect to individual members of the class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and

e)      Defendants have acted in a manner that affects Plaintiffs and all members of the class, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to the class as a whole.

## SUBSTANTIVE ALLEGATIONS

21.     On February 26, 2007, TXU issued a press release announcing that it had executed a definitive merger agreement under which an investor group led by KKR and TPG will acquire TXU in a Proposed Acquisition valued at $45 billion (the "Merger Agreement"). Goldman, Lehman, Citigroup and Morgan Stanley will join KKR and TPG as equity investors at the closing (the "Investor Group") of the merger.  Under the terms of the Merger Agreement, the Investor Group will offer the public shareholders of the Company $69.25 per each share owned.

22.     The Proposed Acquisition requires $8 billion of cash upfront, approximately $24 billion of new debt and the assumption of approximately $13 billion in debt.

23.     A TXU subsidiary, TXU Energy Co., is issuing new debt secured by the entirety of that subsidiary's assets.  The Company plans to issue debt in the form of unsecured notes. TXU also has commitments of $24.6 billion of additional debt financing for the Proposed Acquisition.

24.     KKR and TPG are each putting up about $2 billion in cash.  The investment banks Goldman Sachs, Lehman Brothers, Morgan Stanley and Citigroup collectively plan to invest $3

24786

billion from their respective private equity divisions, bringing the cash total to only $7 billion, $1 billion short of the $8 billion required.

25.     JPMorgan Chase, Morgan Stanley and Citigroup are each lending $1 billion to the Investor Group not as secured debt but in the form of equity using the banks' own cash, known as an "equity bridge." This arrangement allows the Investor Group to buy the Company with even less cash upfront. The Investor Group contemplates finding other investors to ante up the cash-portion of the deal.

26.     The press release further stated that based upon the unanimous recommendation of the Strategic Transactions Committee comprised of purportedly independent TXU directors, the Board approved the Merger Agreement and recommended that TXU's shareholders adopt the agreement.

27.     Under the terms of the agreement, TXU shareholders will be offered $69.25 in cash for each share of TXU common stock held, representing a premium of 15 percent to the closing price of TXU shares on February 22, 2007.

28.     Following the buyout, the Company's current three business divisions are to be reorganized as three separately-operated businesses: (1) generation; (2) transmission and distribution; and (3) retail.

29.     In response to Texas lawmaker's criticism of the Proposed Acquisition, Texas Energy Future Holdings LP, a holding company formed by KKR and TPG and other investors, pledged that the Investor Group will continue its ownership of the utility for at least five years following the closing and to not load any acquisition-related debt onto the utility if its $32 billion-buyout bid should be successful.

24786

30.     Under the terms of the Proposed Acquisition, the surviving entity could emerge with approximately $33 billion of debt.  This level of debt could ultimately lead to higher costs for consumers.  Texas lawmakers are concerned that the new owners will burden the state's regulated energy-delivery business (called Oncor) with such enormous debt that it would be forced to demand rate relief at the Texas Public Utility Commission.  Without this relief, the owners of the new entity will have to place the utility under bankruptcy protection, possibly pitting a federal bankruptcy court against state officials.

31.     On March 2, 2007, TXU disclosed that the Investor Group lined up the $24.6 billion in debt financing to complete the deal.  The total debt for the Proposed Acquisition thus approaches $37 billion, and the announcement indicated that the Investor Group would ultimately contribute less than $8 billion to the deal.  In its annual financial report filed with the SEC, TXU indicated that a "substantial majority" of the new debt would be added to its retail energy division, and none would be added to the transmission business, the only regulated part of its business.

32.     As a result of this disclosure, Fitch Ratings announced that it expected to downgrade the credit of TXU and its subsidiaries for a second time, from double-B-plus to single-B, further into junk-bond territory.  A debt load of nearly $37 billion would put TXU's debt-to-cash flow ratings higher than Dynegy Corp. and much higher than other rivals such as Mirant Corp. and NRG Energy Inc.

33.     One analyst has noted that TXU can handle the debt load as long as its power-generation business keeps producing strong earnings.  TXU benefits from high electricity rates in Texas and the lack of new power plants being built.  However, an economic downturn or the falling in the price of natural gas could cause rates to fall further.

24786



34.     The level of debt in the Proposed Acquisition, combined with TXU's junk-bond status, could mean higher borrowing costs and ultimately higher rates to consumers.

35.     The Proposed Acquisition is expected to close in the second half of 2007, subject to shareholder approval and required federal regulatory approvals, as well as satisfaction of other customary closing conditions.

36.     Credit Suisse Securities and Lazard Freres acted as financial advisors to TXU in connection with the Proposed Acquisition. Sullivan & Cromwell LLP and Cravath, Swaine and Moore LLP served as outside legal advisors to TXU and the Strategic Transactions Committee, respectively, in connection with the Proposed Acquisition.

37.     Citigroup, Goldman Sachs, JP Morgan, Lehman Brothers and Morgan Stanley acted as financial advisors to the Investor Group. Simpson Thacher & Bartlett LLP, Vinson & Elkins LLP, Covington & Burling LLP, Hunton & Williams LLP and Stroock & Stroock & Lavan LLP acted as legal advisors to the Investor Group.

38.     The Company may terminate the Merger Agreement under certain circumstances, including if the Board determines in good faith that it has received a superior proposal, and otherwise complying with certain terms of the Merger Agreement. However, in connection with such termination, the Company must pay a fee of $1 billion to the Investor Group, unless such termination is in connection with a superior proposal submitted by certain persons who made such a proposal prior to the end of the go-shop period of April 16, 2007. If a bid is received within this brief window of time, the termination fee will be $375 million.

39.     On March 13, 2007, the Company reported over the *PRNewswire* that the Company's subsidiaries, TXU Energy Co. and TXU Electric Delivery Co., plan to issue $1.8 billion in new debt to replace existing short-term debt.

24786

10

40.     On March 19, 2007, The Financial Times reported private equity investors Blackstone Group, Carlyle Group and Hellman & Friedman were considering approaching the TXU board with a rival proposal.

41.     On March 28, 2007, the Company reported over the *PRNewswire* that approximately 1.3 million TXU Energy customers in the company's traditional service territory will receive a 6 percent price reduction that will be reflected in their next monthly bill. The Company further stated that, "This price reduction comes as part of a merger agreement announced last month under which an investor group led by Kohlberg Kravis Roberts & Company (KKR) and Texas Pacific Group will acquire TXU Corp."

42.     This price reduction will translate into a significant reduction in income to the Company. For example, residential customers using an average of 1,500 kilowatt-hours of electricity a month will have a reduced bill of approximately $150 annually on their electric bills or in the aggregate a reduction to the Company of $195 million. The current price reduction may have prevented other acquirors from pursuing a purchase of the Company or this division to the detriment of the Company and in favor of the Investor Group.

43.     On April 10, 2007, *Reuters* reported that a unit of Dallas-based Hunt Power has emerged as a potential bidder for the electric delivery business of TXU Corp.

44.     On April 12, 2007, *Reuters* reported that two Texas legislators stated that they want the state attorney general to investigate allegations that TXU threatened legal action against a potential bidder for the company's assets, adding another wrinkle to the struggle between TXU and the Texas Legislature. Paul Hudson, chairman of the Texas Public Utility Commission (PUC), disclosed the existence of a thwarted bid for TXU's transmission unit at a legislative hearing. The Texas House of Representatives on Thursday was expected to debate proposals to

24786

give Hudson and the PUC expanded power to approve or reject utility sales and mergers, such as the TXU transaction. The Texas Senate has passed such a bill. Hudson said he was contacted by the head of Sharyland Utilities, a South Texas electric transmission company owned by members of the powerful Hunt family of Dallas. Sharyland President Hunter Hunt told Hudson that Sharyland wanted to bid for TXU Electric Delivery, but abandoned its plan because of "threatened legal action" by TXU.

45.    A TXU spokeswoman denied that threats were made in the Company's conversations with Sharyland. She said TXU had expressed concern that a partial bid from Sharyland might harm the Proposed Acquisition which has drawn intense scrutiny from Texas lawmakers in Austin and Washington D.C.

46.    Rep. Phil King, chairman of the Texas House Regulated Industries Committee, said Wednesday that Sharyland's contact with the PUC suggested possible "improper conduct" by private parties competing to buy TXU. Meanwhile, Sen. Troy Fraser, chairman of the Senate Business and Commerce Committee, said he forwarded correspondence he sought from Sharyland to the attorney general due to concerns over TXU's possible improper activity.

47.    On April 17, 2007, the Company reported that two executives were named as part of its plan to separate the Company into three distinct units as it moves to be acquired by a group of private equity firms led by KKR and TPG. Specifically, the Company named Tom Baker vice chairman of the Company and Bob Shapard chief executive of its electric delivery business.

48.    On April 18, 2007, the Company reported that no superior offers were received during the "go-shop" period.

24786

49.     Although members of management, including Defendant Wilder, purportedly have not committed to stay with the Company should the Proposed Acquisition go through, *it is anticipated* they will remain with the Company following the Proposed Acquisition.

50.     Unnamed parties have allegedly earned insider-trading profits from the deal. On March 2, 2007, the United States Securities and Exchange Commission announced an informal inquiry into the matter.

51.     The Proposed Acquisition serves no legitimate business purpose for TXU public stockholders. The Proposed Acquisition is *solely* designed to serve the business purposes of the Investor Group without regard to the interests of the public stockholders of TXU.

52.     Furthermore, the public stockholders of TXU are not receiving fair value for their holdings in connection with the Proposed Acquisition. The proposed plan will, for a grossly inadequate consideration, deny Plaintiffs and the other members of the Class their right to share proportionately in the future success of TXU and its valuable assets, while permitting the Investor Group to reap huge benefits from the Proposed Acquisition.

53.     Moreover, Defendants have failed to take steps necessary to ensure Company shareholders will receive maximum value for their shares of TXU common stock. Defendants have failed to conduct an active auction or to establish an open bidding process in order to maximize shareholder value in selling the Company.

### The Merger Price Is Inadequate and Was Arrived At Through a Flawed Process

54.     The Proposed Acquisition has been specifically timed to exploit the uncharacteristically low trading prices in TXU's common stock.

55.     The proposed purchase price is a 16.8% premium to the Company's February 23, 2007 previous closing price, notable because this deal was struck at a time when the merger

24786

13

 

market is near a record level of activity with average deal premiums hovering around 20%. The

premium offered is too low given management's bullish long-term growth forecasts.

56. As described in a June 2, 2007 article appearing in *The Dallas Morning News*, the

market agrees that the price is inadequate:

> Some key analysts think the companies that wish to buy TXU Corp. will have to sweeten their offer to convince shareholders to accept.
>
> The $45 billion offer by Kohlberg Kravis Roberts & Co. and Texas Pacific Group Inc. to buy the Dallas power company just survived a contentious legislative session unharmed. Now the buyers are turning their attention to shareholders, who must vote on the deal.
>
> And considering how high the share price has risen lately, analysts say, investors are probably expecting more money.
>
> "We think that some institutional shareholders might hold out for a higher price," Citigroup analyst Greg Gordon wrote in a research note distributed to the media on Friday.
>
> He says the price could rise to $71 a share from the offer of $69.25, made in February.
>
> TXU and the buyout companies declined to comment on the research note.
>
> Mr. Gordon points out that the offer price is only about 8 percent higher than the fundamental value of TXU as a going concern.
>
> And the premium looks paltry compared with how high the shares of some of TXU's peers have risen in the past few months.
>
> Shares of NRG Energy - the second-largest power generation company in Texas, after TXU - have risen about 40 percent since the TXU deal was announced, closing Friday at $44.43.
>
> But TXU shares have risen only about 13 percent, capped by the offer price.
>
> Mr. Gordon calls this a "chicken or the egg" situation, since the TXU buyout news may have prompted the rise.

24786

14

57.     A June 15 article in *The Dallas Morning News* provided analysis of the offered

consideration:

> One of TXU Corp.'s financial advisers told the company in
> February that building fewer coal-fired power plants could result in
> a higher value for the company, but not as high as selling the
> company.
>
> TXU included the analysis by Credit Suisse in a preliminary proxy
> filing on Thursday with the Securities Exchange Commission. The
> proxy is meant to provide TXU's analysis of the buyout to
> shareholders, who must vote on the deal.
>
> The advisers analyzed the value of TXU's cash flow between now
> and 2012, and came up with a per-share equity range if TXU built
> no new coal plants, five plants or 10 plants. Credit Suisse
> compared those ranges with the offer of $69.25 that Kohlberg
> Kravis Roberts & Co. and TPG made for the company.
>
> The highest range of $53.70 to $67.34 occurred if the company
> built five plants. ***The proxy does not give a range for building all
> 11 plants TXU had announced.***
>
> The analysis supported Credit Suisse's conclusion that the offer for
> TXU is fair.
>
> TXU chief executive John Wilder has said he was considering
> cutting the number of plants the company might build when the
> private equity companies approached him about buying TXU back
> in November.
>
> TXU then hired Credit Suisse to analyze the offer, and the adviser
> presented its findings to the board in February.
>
> When the buyers announced their offer publicly, they also said
> they'd made a pact with some national environmental groups to
> build only three coal plants using traditional technology, the
> dirtiest kind of new plant.
>
> Jeff Eller, a spokesman for the buyout group, said he doesn't know
> if the investment companies considered the financial impact of
> building fewer plants before making that promise.

24786



*Lisa Singleton, a spokeswoman for TXU, said she couldn't explain how the outside advisers came to their conclusions.*

Credit Suisse concluded that building 10 plants would result in a so-called "implied per-share equity reference range" of $48.36 to $63.55. Not building any plants resulted in a range of $50.42 to $61.31.

The adviser also considered other scenarios and analyzed other utility industry buyouts.

TXU management also made projections in the proxy of how much money the company would make during the next five years if it built five coal plants. By 2011, TXU might have net income of $3.3 billion, the proxy states.

The proxy further explains how the buyers propose to finance the deal. All told, the deal would cost about $46.7 billion, including cash, debt assumption, refinancing and fees.

The buyers have commitments for $8 billion in equity financing.

The buyers also have commitments for enough debt financing to cover the approximately $24.6 billion in debt they would take on to fund the deal, the proxy said.

The proxy also shows that Mr. Wilder got 630,762 shares when some options from 2004 vested last year. The value of the stock upon vesting was $28.5 million. If the buyout closes, those shares would be worth $43.7 million. [Emphasis added.]

58.     By agreeing to the terms of the Merger Agreement, the Company, through its

directors and management, utterly failed to engage in a proper and valid process to ensure

reasonable consideration to the Plaintiffs and the Class confirmed by a proper and valid market

check. By agreeing to the Proposed Acquisition, the Company has been severely hamstrung in

its ability to seek out potentially superior offers. The Proposed Acquisition is the product of a

hopelessly flawed process designed to ensure the sale of TXU to one buying group and one

24786

buying group, only, on terms preferential to the Investor Group and to subvert the interests of Plaintiffs and the Class.

59.   The Individual Defendants have initiated an active sales process and, thus, have assumed enhanced duties to maximize shareholder value. Prior to agreeing to sell the Company, however, Defendants failed to conduct a bona fide market check or auction of the Company.

60.   As evidenced by the Preliminary Proxy filed by TXU with the SEC on June 14, 2007, seeking shareholder approval of the Proposed Acquisition, the sales process was directed and driven by Defendant Wilder who, by orchestrating a sale to a private investment consortium (as opposed to a strategic buyer), stood to gain enormous benefits not shared by the Company's public shareholders.

61.   As reflected in the "Background of the Merger Section" of the Proxy, the sales process was initiated in November, 2006 and controlled by Wilder:

> In late November of 2006, a representative of KKR and TPG called our Chief Executive Officer, John Wilder, to express interest in discussing a possible acquisition or other transaction involving TXU Corp. or one or more of its businesses. At the request of this representative, Mr. Wilder met with the representatives of TPG and KKR in Dallas on November 27, 2006 to discuss in more detail their possible interest in a transaction with TXU Corp. At that meeting Mr. Wilder agreed that TXU Corp. would share a limited amount of confidential information regarding TXU Corp. with KKR and TPG, subject to their entry into a confidentiality agreement. On November 30, 2006, KKR and TPG entered into a confidentiality agreement with TXU Corp. and commenced preliminary financial and business due diligence, including meetings in December 2006 and early January 2007 with senior financial executives of TXU Corp. and a small number of additional TXU Corp. executives.

62.   However, it was not until mid December, 2006, "that Wilder advised the chair of the Board of Directors' Finance and Business Development Committee, Michael Ranger, that

24786

17

TXU Corp., KKR and TPG had entered into a confidentiality agreement and were in the midst of preliminary due diligence on TXU Corp." Further, it was not until January 5, 2007, that Wilder "advised Mr. Ranger that KKR and TPG appeared to have a serious interest in making a proposal to acquire the entire company."

63. And it was not until early January 2007, that Wilder advised the entire Board of Directors of KKR and TPG's interest. On January 18, 2007, KKR and TPG orally advised Wilder that they believed that if they were given several weeks of more extensive due diligence and an opportunity to arrange debt financing that they could make by the end of February a fully financed cash offer to acquire TXU Corp. for $66.00 per share of Common Stock. KKR and TPG also requested a period of exclusivity within which to prepare a proposal.

64. Similarly, it was not until January 22, 2007, that Board established the Strategic Transactions Committee to evaluate the KKR/TPG proposal "along with and against TXU Corp.'s other stand alone and strategic alternatives." That committee was comprised of Defendants Ranger (as Chair), Echols, Jack E. Little and Tilton.

65. While the Board of Directors purportedly directed management not to discuss any equity investment in the KKR/TPG transaction or future employment with TXU Corp. if a KKR/TPG transaction should proceed, there is no indication if these discussions already took place during the two-month period of time Wilder was negotiating with KKR and TPG without any Board oversight and/or controlled process in place.

66. On January 22, 2007, TXU retained Credit Suisse and Sullivan & Cromwell LLP ("Sullivan & Cromwell") as its financial and legal advisors, respectively. In addition, the Strategic Transactions Committee retained Cravath, Swaine & Moore LLP ("Cravath") to act as legal advisor to the Strategic Transactions Committee.

24786

18

67. On January 26, 2007, KKR and TPG confirmed in writing their $66.00 per share proposal, and KKR and TPG were provided access to more detailed due diligence information and management presentations. Due diligence then continued until shortly before the parties entered into the Merger Agreement, including ongoing discussions among representatives of KKR and TPG and management regarding TXU Corp.'s business operations and strategy, including TXU Corp.'s plans to construct 11 new coal-fueled generation facilities.

68. The Strategic Transactions Committee also determined not to conduct an auction (even a restricted auction) process on the basis of the following:

> The Strategic Transactions Committee also considered, over several meetings, the identity of other possible acquirors of TXU Corp., their likely degree of interest in such a transaction, the ability and willingness of other potential acquirors to pay more than the KKR/TPG proposal, regulatory issues potentially associated with these potential acquirors, the likelihood that such potential acquirors could quickly complete due diligence and proceed with a transaction and the practical utility of a right to seek higher bids after signing a merger agreement with a KKR/TPG entity.

69. On February 9, 2007, counsel for TXU Corp. provided KKR and TPG with a proposed form of Merger Agreement.

70. On that same date, the Strategic Transactions Committee and the Board of Directors retained Lazard as its financial advisor in recognition of the possibility that Credit Suisse might ultimately participate in the financing of the KKR/TPG transaction or any other potential transaction that TXU Corp. might pursue.

71. On February 17, 2007, at the request of the Strategic Transactions Committee, KKR and TPG made a revised proposal to acquire TXU at a price of $69.00 per share. Upon receiving the revised proposal, the Strategic Transactions Committee determined to seek a higher

24786

price from KKR and TPG and concessions from KKR and TPG on key non-price terms, *rather than opening up a broader auction process.* In response to this proposal, KKR and TPG proposed increasing the price to $69.25 per share which was accepted by the Strategic Transactions Committee and, ultimately, the Board.

### The Lucrative Change of Control Packages to Directors and Executive Officers

72. Upon consummation of the Proposed Acquisition, Defendant Wilder expects to continue to serve as Chairman and Chief Executive Officer of the surviving corporation.

73. The tax free benefits available to certain of the Defendants and management, but not the Company's public shareholders, not only demonstrate a motivation of Company management to push for the Proposed Acquisition, but also demonstrates that Company management likely considered information not made available to the shareholders of the Company.

74. Under TXU Long-Term Incentive Plan ("LTIP") performance awards were designed to provide incentives for TXU. management, over a three-year period, linked to total shareholder return ("TSR", which is stock price appreciation/depreciation plus dividends) as compared to the companies in the Standard & Poor's ("S&P") 500 Electric Utility Index and/or the S&P Multi-Utilities Index, and, for certain awards, in part on an absolute TSR over the relevant performance period. Because the Merger will cause the common stock to cease to be publicly traded, the Organization and Compensation Committee of the Board of Directors decided to end the performance periods under outstanding LTIP awards as of the completion of the Merger and make performance calculations based on relative TSR performance and/or absolute TSR performance through the closing of the Merger as determined by the Organization and Compensation Committee of the Board of Directors measured by the $69.25 Per Share

24786

Merger Consideration (with awards measured on absolute TSR performance adjusted for the duration of the performance period through the closing). The cash amounts payable will be determined by taking the number of shares of Common Stock issuable based upon the performance calculations, multiplied by $69.25.

75.     The estimated value of these payments to Wilder are as follows:

| Name | Grant Year | Number of Shares/Units Issued | Shares Issuable (at maximum performance) | Shares Issuable (based on performance through May 25, 2007) | Implied Pre-Tax Value (based on performance through May 25, 2007) |
|---|---|---|---|---|---|
| John Wilder | 2005 | 300,000 | 634,866 | 238,075 | $16,486,694 |
| | 2006 | 300,000 | 617,000 | 154,250 | $10,681,813 |
| | 2007 | 300,000 | 300,000 | 150,000 | $10,387,500 |

76.     Defendant Wilder's two year LTIP performance award earned and vested as of March 31, 2006, resulted in 393,488 shares and stock units being deferred by Wilder pursuant to limitations in the LTIP in compliance with Section 162(m) of the Internal Revenue Code.

77.     The value of these awards to Wilder based upon the Merger consideration of $69.25 is $57 million.

78.     To join TXU, Wilder had to forfeit certain benefits from his prior employer.  To partially compensate Wilder for a portion of his forgone compensation and to conserve cash payments in a time TXU was cash constrained, TXU established a rabbi trust, which holds 1,000,000 shares of common stock purchased for the benefit of Wilder by TXU.  On June 20, 2005, Wilder elected to defer the distribution of the shares held in the rabbi trust to the later of their original distribution dates, or April 1 following the calendar year during which Wilder's employment with TXU terminates. The number of shares has increased with reinvested dividends to 1,081,057.  Upon the completion of the Merger, these deferred shares will be

24786

converted into the right to receive cash in an amount equal to $69.25 per share, which would result in an aggregate cash out value of $74,863,164.

79.      Upon completion of the Merger, all share units previously earned under the TXU Deferred Compensation Plan for Outside Directors will be paid out in cash in an amount equal to each director's number of units held multiplied by $69.25. The aggregate number of share units held by the directors (including Dr. de Planque, who resigned on March 2, 2007) is 153,914 and the aggregate cash out value at $69.25 is $10,658,545. The average payout per outside director is $819,888 and the highest payout for any outside director is $2,148,550.

80.      Pursuant to Wilder's employment agreement with TXU: (1) if the completion of the Merger occurs after February 23, 2008 and Wilder terminates his employment for any reason within six months following the completion of the Merger, (2) if Wilder is terminated without cause (as defined in the employment agreement), or (3) resigns for good reason (as described in the employment agreement), Wilder will be entitled to the following:

- A prorated annual bonus for the year of termination paid in March of the year following termination;

- A cash severance payment equal to two times Mr. Wilder's annualized base salary and target bonus paid immediately after termination;

- An immediate distribution of trust shares previously earned and vested by him;

- Certain continuing health care and fringe benefits;

- A tax gross-up payment concurrently with and to offset any "golden parachute excise taxes" which may result under Section 4999 of the Code; and

- Any vested, accrued benefits to which he or she is entitled under TXU Corp.'s employee benefits plans paid within thirty days of termination, or, if applicable, according to the terms of the plan, policy or program under which the benefit was granted.

24786

22

81. If the completion of the Merger occurs on or prior to February 23, 2008 and. Wilder terminates his employment for any reason (other than for good reason) within six months following the closing, Mr. Wilder will be entitled to the benefits set forth above, except that Mr. Wilder will not be entitled to receive the cash severance payment and will not receive an immediate distribution of trust shares previously earned and vested by him (instead, the distribution of trust shares will be made in accordance with his June 20, 2005 deferred election).

82. Wilder's employment agreement also provides for an automatic extension if a change of control (as defined in the employment agreement) is completed during the last two years of the initial five year term of the agreement. Consequently, upon completion of the Merger, the term of his employment agreement would be extended until the second anniversary of the completion of the Merger. His employment agreement also provides that he will be entitled to an LTIP award having a target payout of 300,000 shares during each year the term of the agreement is extended.

83. Given an assumed closing date for the Merger of December 1, 2007 and assuming an immediate qualifying termination of each executive officer, the one-time lump sum cash severance amount payable to Wilder (excluding other severance benefits and "golden parachute" gross-ups and cut-backs) in such circumstance would be $9.7 million.

84. Upon the completion of the Merger, all participants (including our executive officers) will become fully vested in their accounts under the TXU Salary Deferral Program, the TXU Second Supplemental Retirement Plan and the TXU Deferred Incentive Compensation Program. In addition, upon completion of the Merger, under the TXU Deferred and Incentive Compensation Plan, (1) all amounts that would mature within 12 months of the completion of the

24786

23

Merger will be deemed matured, and the trustee will pay such amounts in full, within 30 days following the closing; and (2) with respect to all amounts that would mature more than 12 months following the completion of the Merger, participants will be entitled to elect, as of the closing, to have such amounts mature and be distributed on the first anniversary of the completion of the Merger or as of the date they would otherwise mature.

85.     Based on an assumed closing date for the Merger of December 1, 2007, the aggregate accelerated vesting of deferred compensation plans and pension arrangements and the LESOP excess allocation amount for Wilder is $2.9 million.

### The Company's Financial Advisors Are Conflicted

86.     The Company agreed to pay Credit Suisse a fee estimated to be approximately $37 million, $4 million of which was payable upon rendering its opinion and approximately $33 million of which is payable upon the completion of the Merger. In addition, TXU agreed to reimburse Credit Suisse for its reasonable expenses, including fees and expenses of legal counsel and any other advisor retained by Credit Suisse, and to indemnify Credit Suisse and related parties against certain liabilities and other items, including liabilities under the federal securities laws, arising out of its engagement.  It is extraordinarily imprudent to accept and rely upon advice as to the fairness of the consideration being paid to shareholders under the Proposed Acquisition from an investment banker more concerned with whether the Investor Group's offer is accepted than with whether TXU's Board has fulfilled its obligations to Company shareholders to engage in a process leading to an objective, independent opinion as to fair value.

87.     TXU also requested that Credit Suisse and certain of its affiliates offer to provide, arrange, or otherwise assist the Investor Group and other potential buyers in obtaining all or a portion of the financing in connection with acquiring TXU, for which Credit Suisse and such

24786

affiliates would receive compensation. The Proxy fails to even approximate the amount of this compensation.

88. The Proxy also reveals that Credit Suisse and its affiliates from time to time in the past have provided and currently are providing investment banking and other financial services to TXU Corp., for which services Credit Suisse and its affiliates have received, and expect to receive, compensation. Credit Suisse and its affiliates also from time to time in the past have provided, currently are providing and in the future may provide investment banking and other financial services to KKR, TPG, their respective affiliates and certain of their respective portfolio companies, for which services Credit Suisse and its affiliates have received, and may receive, compensation. In addition, Credit Suisse and certain of its affiliates and respective employees and certain private investment funds affiliated and/or associated with Credit Suisse have invested in affiliates of KKR and TPG. Credit Suisse is a full service securities firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services. In the ordinary course of business, Credit Suisse and its affiliates may acquire, hold or sell, for its and its affiliates' own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of TXU, KKR, TPG and any other entities that may be involved in the Merger, as well as provide investment banking and other financial services to such companies.

89. The Proxy fails to disclose the nature of these relationships or the amounts (even approximately) of remuneration Credit Suisse derived (or will derive) from these relationships.

90. In connection with Lazard's services as the financial advisor to the Special Transactions Committee and the Board of Directors, TXU agreed to pay Lazard an aggregate fee of $8 million, $1 million of which became payable upon the execution of the engagement

24786

agreement with Lazard, $5 million of which became payable upon the earliest of the delivery of Lazard's opinion (that was not contingent upon the outcome of the opinion), the execution of the Merger Agreement and the consummation of the Merger and $2 million of which is contingent and will become payable upon the consummation of the Merger. In addition, TXU agreed to pay Lazard an additional fee for Lazard to conduct a process of identifying potential counterparties to a transaction and an alternative acquisition proposal was made. TXU has also agreed to reimburse Lazard for its reasonable expenses (including reasonable fees and disbursements of attorneys) and to indemnify Lazard and certain related parties against liabilities, including certain liabilities under the federal securities laws, arising out of its engagement.

91.     According to the Proxy, Lazard has in the past provided investment banking services to TXU and may have provided and may currently be providing investment banking services to one or more of the Investor Group, or to one or more of their respective portfolio companies or other affiliates, for which Lazard has received and/or may receive customary fees.

92.     The Proxy also reveals that Lazard, as part of its investment banking business, is continually engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, secondary distributions of listed and unlisted securities, private placements, leveraged buyouts, and valuations for estate, corporate and other purposes. In addition, in the ordinary course of their respective businesses, affiliates of Lazard and LFCM Holdings LLC (an entity held in large part by managing directors of Lazard) may actively trade securities of TXU and/or the securities of the portfolio companies and/or affiliates of the equity holders of Parent for their own accounts and for the accounts of their customers and, accordingly, may at any time hold a long or short position in such securities.

24786

93.     The Proxy fails to disclose the nature of these relationships or the amounts (even approximately) of remuneration Lazard derived (or will derive) from these relationships.

94.     Viewing the data and methodology employed by Credit Suisse and Lazard, respectively, in generating their fairness opinions included with the Proxy, together with the revelation in the Proxy regarding their fee structure, much of which is payable in the event the Proposed Acquisition is consummated, underscores that each member of the Board of Directors has failed to fulfill his or her obligations with the care an ordinarily prudent person in a like position would have used under similar circumstances.

### The Proxy Provides Insufficient Information for Reasonable Shareholders to Decide How to Vote Their Shares

95.     The Preliminary Proxy fails to disclose material information necessary for a reasonable shareholder to decide whether to tender their shares.

96.     Among other things, the Proxy fails to disclose:

a.     The amounts earned and nature of work Credit Suisse and Lazard has performed on behalf of the Investor Group and its affiliates at any time between 2000 and 2007;

b.     The Board's rationale for implementing a "straight jacket" approach to the sales process including designating the Company's Chief Executive Officer the point person to lead the process which focused on potential financial buyers to the exclusion of strategic buyer;

c.     A description of what effect the termination fees would have on TXU's cash position and  working capital position;

24786

27

d.   A description of why the Strategic Transactions Committee was formed so late in the process;

e.   A description of exactly when the Board was aware of the negotiations between Wilder and KKR/TPG;

f.   A description of the investigation made by the Board, if any, to confirm that at no point during the process (including in the period of time during which apparently the Board was not apprised of Wilder's negotiations with KKR/TPG) was the employment of TXU management, post-acquisition, a topic of discussion;

g.   A description of the remuneration each Defendant will receive upon consummation of the Proposed Acquisition;

h.   An adequate summary of management's financial projections beyond merely EBITDA and capital expenditures on a company-wide basis. Notably,  segment information was not provided and both Credit Suisse and Lazard use more detailed projections than are set out in the Proxy;

i.   An adequate description of the alternative business scenarios contained in the projections.  Notably, in rendering it opinion, Credit Suisse expressly stated it relied on such scenarios and assumptions (*see* Proxy at p. 27 "Company Financial Analyses" "Discounted Cash Flow Analysis");

j.   A description of the internal estimates Credit Suisse used in calculating Discounted Cash Flow value for some of TXU's business segments that were purportedly based on projections supplied by management (*e.g.*, the

24786

value of Power Direct program and the gas plant portfolio was "based on internal estimates of TXU Corp.'s management" (Proxy at page 27));

k.    The projections set forth in the Proxy are based upon information that was available shortly before the Merger Agreement was signed and needs to be updated.  For example, if the deal were to fall through, management would presumptively change its strategy regarding coal-fired plants and permits, which would dramatically change TXU's value;

l.    How each of the Companies set forth in Credit Suisse's "Selected Company Analysis" were selected, what were the metrics chosen for the analysis, and what was the range of values for each of the metrics derived;

m.    How each of the transactions set forth in Credit Suisse's "Selected Transactions Analysis" were selected, what were the metrics chosen for analysis, and what was the range of values for each of the metrics derived; and

n.    The segment projections utilized by Lazard in calculating DCF value for all business segments purportedly using projections provided by TXU.

97.    Plaintiffs seek preliminary and permanent injunctive relief enjoining the vote of TXU shareholders by reason of the foregoing deficiencies in the Proxy, and restraining consummation of the Freeze-out -- the product of a flawed sales process engaged in by the individual Defendants in violation of their fiduciary duties.

98.    Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiffs and the Class, will continue to engage in improper conduct, and Plaintiffs and the Class will be deprived of the fair value of their investment in TXU's valuable assets and businesses to which they are entitled.

24786

**Conflicts of Interests in Buyouts by Private Equity Firms Fail**
**To Result In Highest Price Reasonably Obtainable for Shareholders**

99.      As described herein, the above described conflicts are only compounded by allegations and a Department of Justice investigation into the practice of many private equity buyers of forming clubs (as in the instant action) which have the effect of limiting competition and destroying the validity of any a company sales process by artificially depressing the sales price.

100.      According to an article appearing in *The Wall Street Journal* on September 8, 2006, the process through which a Company is sold to private equity buyers is generally skewed in favor of the Company's management. *The Wall Street Journal* article highlighted this conflict as follows:

> In such cases [where a company is being sold to private equity firms], management, with all its detailed knowledge of the company, goes from being a seller striving for a high price to being a buyer looking for an attractive price. Usually the sale of a public company involves an auction or a competitive-bidding process. But when management joins the private-equity buyers, there often isn't such an open procedure, and the process is especially fraught with potential conflicts of interest.

* * *

> ***There is little that is more important to a private-equity firm than courting the management of a potential target. A critical part of the wooing process is to offer management lavish incentives. Those incentives generally involve as much as a 10% stake in the reorganized company -- far more than managements can usually hope for either as a public company or from a strategic buyer.*** If management hits financial and operational targets set by the new owners, the executives generally receive stock and options. If the executives exceed those targets, they get more of both. And when the company is recapitalized or goes public, the executives often get windfalls valued at hundreds of millions of dollars.

* * *

24786

While some boards are diligent in vetting deals, the process sometimes is skewed in favor of a sale. For example, there usually is a period when other bidders can come forth with offers. But if that window is short, the likelihood of a rival bid emerging isn't large, since potential buyers won't have time to perform due diligence. ***Special committees charged with weighing deals also can set breakup fees that make rival bidders pay dearly to get rid of the original buyer.*** [Emphasis added].

101.   Indeed, the formation of so-called "clubs" (the Investor Group in the present case) to acquire publicly-held corporations has become the subject of a probe by the Department of Justice, which has reportedly begun an inquiry into potentially anticompetitive behavior among leading private-equity firms. According to an October 11, 2006 article in *The New York Times*, this informal investigation "appear(s) to be the beginning of a wide-ranging inquiry into private equity . . . ," because the industry that "has become [] increasingly powerful [] on Wall Street in recent years [and] remains relatively unregulated." According to news reports, among the issues that could come under scrutiny is the private equity firms' practice of joining together on some bids. According to *The New York Times* article, this issue is particularly grave because "[w]hen firms [] form consortiums, or clubs, as they are known in the industry, to bid on a specific company, that could have the effect of limiting competition and thus artificially depressing the price of takeover bids -- and hurting corporate shareholders in the process."

102.   As a result of Defendants' unlawful actions, Plaintiffs and the other members of the Class will be irreparably harmed in that the nature and value of their investment in TXU will be compromised for the sole benefit of the Investor Group. Unless the Court enjoins the Proposed Acquisition, the Individual Defendants will continue to breach the fiduciary duties owed to Plaintiffs and the members of the Class, all to the irreparable harm of the members of the Class.

24786

31

103.   Defendants KKR and TPG have conspired in, and aided and abetted, the breaches of fiduciary duty described herein.  The Company, through its management, has participated in the conduct described herein, and if the Proposed Acquisition is allowed to proceed, it will result in the public shareholders being forced to cash out their desired investment (and the future benefit they hoped to enjoy therefrom).  Because the Company shall cease to exist as a result of the Proposed Acquisition, TXU must ensure that its public shareholders enjoy every benefit and obligation owed to it by the Individual Defendants

104.   Plaintiffs and the other members of the Class have no adequate remedy at law.

## COUNT I

### Direct Claim for Breach of Fiduciary Duty Against Individual Defendants

105.   Plaintiffs adopt by reference herein as if set forth fully herein each and every allegation set forth in this Consolidated Amended Complaint.

106.   The Individual Defendants (including at least a majority of the Individual Defendants who are also members of the Company Board of Directors), by engaging in fraud, self-dealing and/or unconscionable conduct, each have violated and breached their fiduciary duty of candor owed by each of the Individual Defendants to each public shareholder of TXU.

107.   By the acts, failures to act, transactions and courses of conduct alleged herein, each of the Individual Defendants, acting individually and as a part of a common plan, are attempting to unfairly deprive Plaintiffs and other members of the Class of the benefit of a fair and valid process for consideration of the Proposed Acquisition, for the consideration of other transactions with different terms and for the true and fair value of their investment in TXU.

108.   The Individual Defendants have violated and breached their fiduciary duties owed to Plaintiffs and the Class by entering into the Proposed Transaction while failing to act in good

24786

faith, failing to act in a manner reasonably believed to be in the best interests of the Company (and/or, since the Company will no longer exist should the Proposed Transaction be allowed to proceed, in the best interests of Plaintiffs and the Class who are being forced to surrender their ongoing investment in the business of the Company), and failing to act with the care an ordinarily prudent person in a like position would use under similar circumstances.

109.    As demonstrated by the allegations set forth herein, the Individual Defendants each have breached their duty of candor owed to the shareholders of TXU because, among other reasons, they failed to make appropriate disclosures in the Proxy.

110.    Because the Individual Defendants dominate and control the business and corporate affairs of TXU and are in possession of private corporate information concerning TXU's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of TXU which makes it inherently unfair for them to pursue any proposed transaction wherein they will reap benefits disproportionate to those enjoyed by the Company's public shareholders and that override engaging in a process that ensures TXU's public shareholders receiving fair value for their investment.

111.    As a result of the actions of the Individual Defendants, Plaintiffs and the Class will suffer irreparable injury by being prevented from obtaining all material information necessary to make an informed vote with respect to the Proposed Acquisition.

112.    Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiffs and the Class, and may consummate the Proposed Acquisition which will exclude the Class from its fair share of TXU's valuable assets and

24786

businesses, and/or benefit the Individual Defendants in an unfair manner as complained of herein, all resulting in the irreparable harm to Plaintiffs and the Class.

## COUNT II

### Aiding and Abetting Breaches of
### Fiduciary Duty Against KKR and TPG

113.   Plaintiffs repeat and reallege each allegation set forth above.

114.   KKR and TPG aided and abetted the Individual Defendants in breaching their fiduciary duties owed the public shareholders of TXU, including Plaintiffs and the members of the Class.

115.   The Individual Defendants owed to Plaintiffs and the members of the Class certain fiduciary duties as fully set out herein.

116.   By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to Plaintiffs and the members of the Class.

117.   KKR and TPG colluded or aided and abetted the Individual Defendants' breaches of fiduciary duties, and are active and knowing participants in the Individual Defendants' breaches of fiduciary duties owed to Plaintiffs and the members of the Class.

118.   KKR and TPG agreed to participate in the breach of the fiduciary duties by the Individual Defendants to the purpose of advancing their own interests.  KKR and TPG will obtain both direct and indirect benefits from colluding in or aiding and abetting the Individual Defendants' breaches.  KKR and TPG will benefit, *inter alia*, from the acquisition of the Company pursuant to a defective sales process at a grossly inadequate and unfair price if thee Proposed Acquisition is consummated.

24786

34



119. Plaintiffs and the members of the Class shall be irreparably injured as a direct and proximate result of the aforementioned conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against the Defendants jointly and severally, as follows:

A. Declaring and decreeing this Action to be a class action and certifying Plaintiffs as class representatives;

B. Declaring and decreeing the Proposed Acquisition agreement was entered into in breach of the fiduciary duties of Defendants and is therefore unlawful and unenforceable;

C. Enjoining, preliminarily and permanently, the consummation of the Proposed Acquisition, unless and until the Company adopts and implements procedures or process to comply with applicable law;

D. Directing Defendants to exercise their fiduciary duties to obtain a deal that is in the best interests of TXU and its public shareholders;

E. To the extent, if any, that the Proposed Acquisition complained of is consummated prior to the entry of this Court's final judgment, rescinding such Proposed Acquisition, and granting, *inter alia*, rescissory damages;

F. Imposition of a constructive trust, in favor of Plaintiffs, upon any benefits improperly received by Defendants as a result of their wrongful conduct;

G. Awarding Plaintiffs the costs and disbursements of this Action, including a reasonable allowance for the attorneys and experts' fees and expenses; and

H. Granting Plaintiffs and the other members of the Class such other and further relief as may be just and proper.

24786

## JURY TRIAL DEMAND

Plaintiffs and the Class demand a trial by jury on all issues so triable.

Dated: July 3, 2007

Respectfully submitted,

HUBBARD & BIEDERMAN, L.L.P.

By: _____
STEPHEN L. HUBBARD
State Bar No. 10140500
slhubbard@hblawfirm.com
ROBERT W. BIEDERMAN
State Bar No. 02301050
rwbiederman@hblawfirm.com
DAVID M. GROSSMAN
State Bar No. 00787598
dmgrossman@hblawfirm.com
1717 Main Street, Suite 4700
Dallas, Texas 75201
Telephone: (214) 857-6000
Fax: (214) 857-6001

*ATTORNEYS FOR PLAINTIFFS*

*Of Counsel:*

BULL & LIFSHITZ LLP
Peter D. Bull
Joshua Lifshitz
18 East 41st Street
New York, NY 10017
Tel: 212 213-6222

HARWOOD FEFFER LLP
Robert I. Harwood, Esq.
Jennifer K. Hirsh, Esq.
488 Madison Avenue
New York, New York 10022
Tel: 212-935-7400

24786

36

ORIGINAL

JS 44 (Rev. 10/06)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
ERNEST GOTTDIENER and SAMUEL T. COHEN, on behalf of themselves and all others similarly situated,

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

RECEIVED
JUL - 3 2007
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

## DEFENDANTS
LELDON E. ECHOLS, KERNEY LADAY, JACK E. LITTLE, GERARDO I. LOPEZ, J.E. OSESTERREICHER, MICHAEL W. RANGER (SEE ADDITIONAL SHEET) DALLAS

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
ROBERT W. BIEDERMAN, ESQ.
HUBBARD & BIEDERMAN, LLP

Attorneys (If Known)

3-07CV1200-P

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | **PERSONAL INJURY** | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Med. Malpractice | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | ☐ 365 Personal Injury - Product Liability | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | **PERSONAL PROPERTY** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 370 Other Fraud | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 371 Truth in Lending | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 380 Other Personal Property Damage | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 385 Property Damage Product Liability | | | |
| **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | |
| ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 442 Employment | **Habeas Corpus:** | | | |
| ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 444 Welfare | ☐ 535 Death Penalty | | | |
| ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | |
| ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | |
| ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)
☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Sec. 1332
Brief description of cause: Shareholder Class Action

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ Injunction, other
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) PENDING OR CLOSED
(See instructions): (SEE ADDITIONAL SHEET)
JUDGE _____ DOCKET NUMBER _____

DATE 7/3/07
SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

ADDITIONAL INFORMATION PAGE
(FOR CIVIL COVER SHEET)


DEFENDANTS (CONTINUED)

Leonard H. Roberts, Glenn F. Tilton, C. John Wilder, TXU Corp., Kohlberg Kravis
Roberts & Co., and Texas Pacific Group

(c)     Robert W. Biederman, Esq.
        Hubbard & Biederman, LLP
        1717 Main Street, Suite 4700
        Dallas, Texas 75201
        (214) 857-6000

        Peter D. Bull, Esq.
        Bull & Lifshitz, LLP
        18 East 41st Street
        New York, NY 10017
        (212) 213-6222

        Robert I. Harwood, Esq.
        Harwood & Feffer LLP
        488 Madison Avenue
        New York, NY 10022
        (212) 935-7400

    VIII.    RELATED CASE(S) PENDING OR CLOSED

            1. JUDGE – SAM A. LINDSAY            DOCKET NO. 3:07-CV-406-L

            2.  JUDGE – SAM A. LINDSAY           DOCKET NO. 3:07-CV-422-L